### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA and THE COMMONWEALTH OF MASSACHUSETTS,** ) ) | |
| | ) |
| *ex rel.* **STEPHEN A. COHEN,** ) | **CIVIL ACTION NO:** |
| | ) |
| **Plaintiffs,** ) | **COMPLAINT AND DEMAND FOR JURY** |
| | ) |
| **v.** ) | **TRIAL** |
| | ) |
| **BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,** ) | **FILED UNDER SEAL PURSUANT TO** |
| | ) **31 U.S.C. § 3730(b)(2)** |
| **Defendant.** ) | |

## INTRODUCTION

1.     Plaintiff-Relator Stephen A. Cohen, M.D. ("Relator"), on his own behalf and on behalf of the United States of America ("the U.S."), and the Commonwealth of Massachusetts ("the Commonwealth"), brings this *qui tam* action against the defendant, Beth Israel Deaconess Medical Center, Inc.

2.     This action is brought pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("the FCA"), and the Massachusetts False Claims Act, Mass. Gen. Laws c. 12, §§ 5A, *et seq.* ("the MFCA").

3.     As used in this complaint, the term "Federal health care programs" shall have the same meaning as defined in 42 U.S.C. § 1320a-7b(f), and it therefore includes Medicare, Medicaid, TRICARE (administered by the Department of Defense through its component agency, Champus), CHAMPVA (administered by the Department of Veterans Affairs), the Federal Employee Health Benefits Program (administered by the United States Office of Personnel Management), the Railroad Retirement Medicare program

(administered by the Railroad Retirement Board), and the Indian Health Service (administered by the Department of Health and Human Services).

4.      Relator seeks civil penalties, damages, declaratory relief, injunctive relief and such other relief as is available under the FCA and/or the MFCA, and demands a trial by jury for all claims for which the right to a jury trial is authorized.

5.      This case arises from the defendant's unlawful acts and practices concerning claims for reimbursement under Federal health care programs for hospital visits and ancillary perioperative medical and laboratory testing.  The defendant has (a) presented false or fraudulent claims for payment, (b) made or used false records or statements material to the false or fraudulent claims, and (c) knowingly failed to refund the full amount of overcharges, which has resulted in "reverse false claims."

6.      During the period from no later than 2001 to the present, the defendant has knowingly submitted tens of thousands of false claims, records and statements, which have caused overpayments by Federal health care programs to the defendant of millions of dollars.  The defendant also has knowingly concealed, avoided or decreased its obligations to refund these overpayments to the U.S. and the Commonwealth.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 31 U.S.C. § 3730 and 31 U.S.C. § 3732.  Pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b), this Court has supplemental jurisdiction over the claims brought under the MFCA.

8.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendant can be found, resides and transacts business in this district.

## **PARTIES**

9.     Plaintiff-Relator Stephen A. Cohen, M.D., is an individual residing in Middlesex County, Massachusetts.

10.     Defendant Beth Israel Deaconess Medical Center, Inc. ("BIDMC") is a Massachusetts corporation with its principal place of business located at 330 Brookline Avenue, Boston, Massachusetts.

11.     BIDMC is a wholly-owned subsidiary of CareGroup, Inc. ("CareGroup"). CareGroup is a Massachusetts corporation with its principal place of business located at 109 Brookline Avenue, Suite 300, Boston, Massachusetts.

## **FACTUAL ALLEGATIONS**

### A. **Overview**

12.     As it describes itself on its website, BIDMC is "a major teaching hospital of Harvard Medical School[,]" and "one of the nation's preeminent academic medical centers." BIDMC further asserts on its website that it "hosts more than three quarters of a million patient visits annually in and around Boston."

13.     Nearly half of BIDMC's gross patient service revenue is derived from Medicare and Medicaid payments. For example, for the fiscal year ending September 30, 2012, CareGroup reported that Medicare and Medicaid accounted for thirty-six percent (36%) and thirteen percent (13%), respectively, of BIDMC's gross patient service revenue.

14.     In BIDMC's hospital cost report for the fiscal year ending September 30, 2012, according to American Hospital Directory, Inc., BIDMC's gross patient revenue was over $2.2 billion.

3

15.     Relator is a board certified anesthesiologist who has worked at BIDMC

since 2000 as an employee of Harvard Medical Faculty Physicians at Beth Israel

Deaconess Medical Center, Inc. ("HMFP"). As BIDMC explains on its website, HMFP:

> is the employed physician group at BIDMC. HMFP employs
> approximately 800 Harvard Medical School faculty members, and
> has an exclusive affiliation agreement with BIDMC for research,
> teaching and patient care services. Each of BIDMC's 13
> Departments has an HMFP Department Head who is the 'Chief of
> Service.' HMFP provides comprehensive practice management
> services (e.g., benefits, payroll and accounting) to the BIDMC
> faculty members.

16.     In 2003, after a national search, Relator was selected to serve as the

Department of Anesthesiology's Director of Ambulatory Anesthesia and as the Medical

Director of BIDMC's Pre-Admission Testing Clinic ("PAT Clinic").

17.     Patients who are scheduled for elective surgery at BIDMC generally are

evaluated by BIDMC's PAT Clinic to undergo pre-procedure evaluation and medical and

laboratory testing. As noted by BIDMC's Office of Compliance and Business Conduct

("OCBC"), BIDMC's PAT Clinic conducts "pre-anesthesia assessments, history and

physicals, chart reviews and anesthesia consultations."

18.     As organized by BIDMC, the PAT Clinic falls under the auspices of the

Nursing Department, as opposed to the Anesthesiology Department. Ms. Elena Canacari

("Canacari"), the Director of Perioperative Services, is responsible for overseeing the

PAT Clinic. Canacari reports to Ms. Marsha Maurer ("Maurer), Senior Vice President,

BIDMC Patient Care and Chief Nursing Officer. Ms. Susan Dorion ("Dorion") is the

Nurse Manager of the PAT Clinic.

19.     As explained in greater detail below, Relator, in his role as the Medical

Director of the PAT Clinic, discovered that BIDMC had been improperly billing, and

4

being reimbursed by, Federal health care programs for years. Relator promptly reported the fraud to his supervisor, Dr. Brett Simon ("Simon"), Chair of the Department of Anesthesia, Critical Care and Pain Management, to OCBC and to others within BIDMC, and Relator tried to stop the fraud.

20.     In or about 2010, the Office of Inspector General of the Department of Health and Human Services ("OIG"), the U.S. Department of Justice and the U.S. Attorney's Office for the District of Massachusetts ("U.S. Attorney") began investigating BIDMC for other unrelated alleged improprieties. As CareGroup disclosed in August 2011, OIG served BIDMC with a subpoena "seek[ing] documents and other information related to short-stay admissions during the period June 1, 2004 through February 4, 2010." On July 29, 2013, BIDMC agreed to pay the U.S. over $5.3 million to settle allegations that BIDMC violated the FCA by inappropriately submitting claims to Medicare for (i) "one-day stay inpatient admissions for patients with congestive heart failure, chest pain, and certain digestive and nutritional disorders[,]" and (ii) "less-than-one day (zero day) stays that should have been filled as outpatient or observation services." US Attorney Press Release, dated 7/29/13. Among his other comments about the settlement, Mr. Jamie Katz, BIDMC's general counsel, stated that the settlement amount "will have no effect on hospital operations."

21.     In 2012, while the investigation described in paragraph 20, above, was pending, OCBC finally responded to Relator's reports of BIDMC's improper billing practices by conducting a comprehensive internal audit of forty-one (41) randomly selected Medicare and Medicaid cases from January 2011 and January 2012 ("the OCBC Audit"). Twenty-two (22) of the cases in the OCBC Audit had dates of service in

5

January 2012, while the remaining nineteen (19) cases had dates of service in January 2011. The OCBC Audit confirmed a startling error rate of 100% - - in every single one of these cases, BIDMC wrongfully sought and obtained reimbursement from Medicare and Medicaid. These particular false claims are identified in the BIDMC Audit Spreadsheet, which is attached hereto as Exhibit 1 and incorporated herein by reference (Patient names have been redacted to maintain their privacy).

22.    Notwithstanding the findings from its self-audits, BIDMC has neglected to extrapolate from those findings to determine the full extent of its wrongdoing and the full extent of overpayments. Moreover, BIDMC has neglected to put a stop to all of the unlawful practices that OCBC has identified.

23.    As a consequence of BIDMC's acts and practices, the U.S. and the Commonwealth have expended a significant amount of money through Federal health care programs by reimbursing BIDMC for hospital visits and ancillary medical and laboratory tests that were not properly subject to reimbursement. Moreover, BIDMC has knowingly concealed, avoided or decreased its obligations to refund these overpayments to the U.S. and the Commonwealth.

## B. BIDMC'S Fraudulent Practices

### *BIDMC'S "Routine Package" of Tests*

24.    From no later than September 2001 and continuing until at least August 2011, BIDMC submitted thousands of claims to Federal health care programs for reimbursement for electrocardiogram ("EKG" or "ECG") tests, complete blood count ("CBC") tests, blood bank type and screen ("T&S") tests and incidental venipuncture procedures that were medically unnecessary and/or not ordered by physicians.

6

25.    The polestar rule of Medicare (and that of Medicaid and other Federal health care programs) declares that no payment may be made "for any expense incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A). *Accord* 42 C.F.R. § 419.22 ("The following services are not paid for under the hospital outpatient prospective payment system: . . . (p) Services that are not covered by Medicare by statute.  (q) Services that are not reasonable or necessary for the diagnosis or treatment of an illness or disease.")

26.    Medical and laboratory tests and services that are performed in the absence of signs, symptoms, or personal history of disease or injury (*i.e.*, "screening tests") are not (with limited exceptions not applicable here) subject to reimbursement by Medicare, Medicaid and other Federal health care programs. *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 66 Fed. Reg. 58788, 58810 (Nov. 23, 2001).

27.    "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary. . . .Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a). "Incidental services such as venipuncture" are not separately reimbursable. 42 C.F.R. § 419.2(b)(7).

28.    Medicare has issued a National Coverage Determination with respect to EKGs, which states explicitly that "EKG services are covered diagnostic tests when there are documented signs and symptoms or other clinical indications for providing the service[,]" but "[t]here is no coverage for EKG services when rendered as a screening test

or as part of a routine examination[.]" Medicare National Coverage Determinations Manual, Ch. 1, Part 1, § 20.15(A)(1).

29.     BIDMC's compliance policy, Policy# ADM-09, states that examples of "false claims" include "billing for services that are not medically necessary and reasonable . . . or otherwise providing misleading information."

30.     In May 2001, BIDMC adopted Policy# PSM 300-2, entitled "Pre-Procedure Testing Criteria." The stated purpose of BIDMC's Policy# PSM 300-2 was "[t]o ensure that all patients having surgery at BIDMC undergo medical testing up to 30 days prior to surgery." Canacari, BIDMC's Director of Perioperative Services who oversees the PAT Clinic, was the "Author/Owner/Chair" of Policy# PSM 300-2. Maurer, Senior Vice President, BIDMC Patient Care and Chief Nursing Officer, was the "Vice President Sponsor" of Policy# PSM 300-2.

31.     Pursuant to the version of BIDMC's Policy# PSM 300-2 in effect until November 2008, every patient over the age of fifty (50) who was having elective surgery at BIDMC had to have an in-person visit at the PAT Clinic (unless they qualified for a waiver). BIDMC's Policy# PSM 300-2 further directed that "[n]o testing [was] required for healthy patients <50 years of age[,]" but that, *inter alia*, "[a]n EKG [was] required for patients with advanced age (>50 years of age)[,]" regardless of the patient's health.

32.     Pursuant to the version of BIDMC's Policy# PSM 300-2 in effect from November 2008 until at least August 2011, every patient over the age of forty-nine (49) who was having elective surgery at BIDMC had to have an in-person visit at the PAT Clinic (unless they qualified for a waiver). BIDMC's Policy# PSM 300-2 further directed that "[n]o testing [was] required for healthy patients 49 years or younger [,]" but

8

that, *inter alia*, "[a]n EKG [was] required for patients that are: 50 years or older[,]" regardless of the patient's health.

33.     The nursing personnel in the PAT Clinic implemented BIDMC's Policy# PSM 300-2 by, *inter alia*, creating a "Routine Package" of screening tests, which specifically included the following: "CBC [complete blood count] for patients older than 55 years"; "EKG for patients older than 50 years"; and "Blood Bank Type and Screen." The "Routine Package" of screening tests was identified on the "Pre-Admission Testing (PAT) Surgical Pre-Procedure Orders" form ("PAT Order Form") that the PAT Clinic distributed to surgeons for their use in ordering ancillary medical and laboratory tests.

34.     The PAT Order Form directed surgeons as follows: "Choose a routine package or individual lab tests. . . . Please note that if no selection is made, the routine lab test package will be ordered." Pursuant to this policy, Federal health care program patients underwent one or more of the screening tests included in BIDMC's "Routine Package" even if those tests were not ordered by a physician. For instance, the OCBC Audit confirmed that, twenty-two (22) of the forty-one (41) audited cases "did not have a valid physician/practitioner order for ancillary testing." *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 1-41).

35.     In some cases, even when a physician selected only some of the individual medical and laboratory tests that were part of BIDMC's "Routine Package" of screening tests, personnel in the PAT Clinic would "order," and BIDMC would bill for, those tests from the "Routine Package" that were not individually ordered by the physician. For instance, the physician for Patient 13 from the OCBC Audit individually ordered only the

CBC and T&S screening tests, and the PAT Clinic personnel ordered, and BIDMC billed for, the ECG test. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patient 13).

36.     Pursuant to its internal policies, BIDMC funneled thousands of patients into the PAT Clinic each year.  For instance, during fiscal years 2009 through 2012, there were forty-two thousand forty-nine (42,049) in-person patient visits in the PAT Clinic.

37.     Pursuant to its internal policies, BIDMC ensured that every person who aged into the Medicare system who was seen in the PAT Clinic would be obliged to undergo one or more of the screening tests included in BIDMC's "Routine Package." For example, the PAT Clinic conducted over fifteen thousand three hundred (15,300) EKGs during the period from October 2009 through August 2011.  During the same period, the PAT Clinic conducted over fifteen thousand six hundred (15,600) venipuncture procedures incidental to blood tests.

38.     Before BIDMC submits claims to Federal health care programs for reimbursement for the "Routine Package" of screening tests, BIDMC "scrubs" the claims: *i.e.*, adds diagnosis codes to the claims.  By adding these diagnosis codes in this manner, BIDMC created the false impressions that the tests in BIDMC's "Routine Package" were not screening tests, but instead were medically necessary and had been ordered by the treating physician.

39.     BIDMC's "scrubbing" of Federal health care claims is accomplished by coders in BIDMC's Patient Financial Services Department and BIDMC's Health Information Management Department. Ms. Beth O'Toole ("O'Toole") was BIDMC's Senior Director of Patient Financial Services (now BIDMC's Senior Director of Revenue

Cycle Management), and Ms. Geraldine "Gerry" Abrahamian ("Abrahamian"), is
BIDMC's Director of Health Information Management.

40.     In the February 2013 draft OCBC Audit report, OCBC provided the
following overview of BIDMC's billing system: "The PAT practitioner copies/completes
order forms for ancillary testing."; "Charges are keyed into CCC [*i.e.*, the Clinical Care
Computer] and flow directly to IBAX [*i.e.*, BIDMC's computer billing system]."; "Edits
(scrubbing) occurs in IBAX prior to billing."

41.     In thirty-nine (39) of the forty-one (41) cases from the OCBC Audit, the
patient was over the age of forty-nine (49) at the time of the PAT Clinic visit, and in
every one of those cases BIDMC improperly charged for one or more of the screening
tests included in BIDMC's "Routine Package."  Medicare and Medicaid reimbursed
BIDMC for these tests.  For instance, with the exception of Patients 8 and 24, both of
whom were under the age of fifty (50), every one of the patients identified in OCBC's
internal audit underwent EKG testing. *See* BIDMC Audit Spreadsheet, Exh. 1
(identifying Patients 1-7, 9-23 & 25-41).

42.     Due in large part to Relator's efforts, BIDMC's Policy# PSM 300-2 was
amended effective August 29, 2011.  BIDMC's policy now provides in pertinent part as
follows: "The primary assessment for patients who are healthy, have minimal surgical
risk and do not meet criteria for an in-person visit or waive evaluation will be done by a
clinic RN via a telephone assessment.  Any clinical issues identified during the telephone
interview will be discussed with the anesthesiologist, and a decision may be made to
bring the patient into PAT for evaluation."  The amended policy further directs as
follows: "No routine laboratory or diagnostic screening test is necessary for the pre-

11

anesthetic evaluation of patients. All tests should be indicated for specific medical conditions, and the medical necessity must be documented with the proper ICD-9 code [*i.e.* diagnosis code]."

43.     The change in BIDMC's policy concerning the "Routine Package" of screening tests was explained in part by Ms. Dina Crosta Moran ("Moran"), from BIDMC's Cardiology Department, in an August 23, 2011 email sent to Dr. John Markis the Medical Director of BIDMC's ECG Laboratory and Ms. Jeanne Thompson, from HMFP's billing department. As Moran wrote: "It is my understanding from a conversation Daniel [Ibañez, the Administrative Director of the Division of Cardiovascular Medicine] and I had with Susan Dorion [the Nurse Manager of the PAT Clinic] yesterday that the criteria for having pre-op ekgs will be changing. In the past it is my understanding that these were performed on any patients [sic] over 50. This will no longer be the case. They will now be performed only on patients who have a clinical indication for needing an EKG." (emphasis added).

44.     In the February 2013 draft OCBC Audit report, O'Toole represented in her "Management Response" to the OCBC Audit and OCBC's recommendations that "[a]ll ancillary testing identified as overpayments in this audit have been refunded[.]" (emphasis added). In the March 2013 final OCBC Audit report, O'Toole represented in her "Management Response" that "[a]ll ancillary testing without authenticated orders identified in this audit have been refunded." (emphasis added). Any such refunds made by BIDMC were improperly limited to just the forty-one (41) specific cases in the OCBC Audit.

12

45.     The EKGs, CBC tests, T&S tests, and incidental venipuncture procedures that were conducted as part of BIDMC's "Routine Package" of screening tests from 2001 through 2011 were not properly subject to reimbursement by Federal health care programs.

46.     BIDMC's submission of claims to Federal health care programs for reimbursement for the EKGs, CBC tests, T&S tests, and incidental venipuncture procedures that were not properly subject to reimbursement were false claims. BIDMC's false claims resulted in overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

### *Pulse Oximetry Tests*

47.     From no later than September 2001 and continuing until at least February 2013, BIDMC submitted thousands of claims to Federal health care programs for reimbursement for pulse oximetry tests that were medically unnecessary and/or not ordered by physicians.

48.     Pulse oximetry tests, which are noninvasive tests that analyze oxygen saturation in blood, are administered routinely in the PAT Clinic and throughout BIDMC in general. For instance, between October 2009 and February 2013, the PAT Clinic administered twenty-four thousand six hundred (24,600) pulse oximetry tests.

49.     The PAT Clinic administered pulse oximetry tests on nearly every patient who came for an in-person visit during March and April 2013. Specifically, in March 2013, every one of the six hundred ninety-three (693) patients who was seen in the PAT Clinic had a pulse oximetry test. In April 2013, six hundred and fifty-five (655) of the

13

six hundred and sixty-one (661) patients who were seen in the PAT Clinic had a pulse oximetry test.

50. The OCBC Audit confirmed that, in 100% of the forty-one (41) cases audited by OCBC, BIDMC improperly submitted claims for reimbursement to Medicare or Medicaid for a pulse oximetry test. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 1-41). BIDMC's internal audit further confirmed that "0 of 41 cases had valid practitioner orders for the test." Medicare and Medicaid reimbursed BIDMC for these tests.

51. In March 2013, in her "Management Response" to the OCBC Audit and OCBC's recommendations, O'Toole represented that "[c]harging for pulse oximetry has stopped (on 2/22/2013)[.]" In her "Management Response," O'Toole made no mention of any refunds of any overpayments for pulse oximetry tests.

52. The pulse oximetry tests routinely administered by BIDMC were not properly subject to reimbursement by Federal health care programs.

53. BIDMC's submission of claims to Federal health care programs for reimbursement for pulse oximetry tests that were not properly subject to reimbursement were false claims. BIDMC's false claims resulted in overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

### *MRSA Tests*

54. From no later than September 2001 and continuing until at least December 2012, BIDMC submitted thousands of claims to Federal health care programs for reimbursement for tests to screen for methicillin-resistant Staphylococcus aureus

14

("MRSA"), which screening tests were medically unnecessary and/or not ordered by physicians.

55.     Pursuant to an internal BIDMC policy, MRSA screening tests are conducted on every patient who is scheduled to undergo heart surgery or joint replacement surgery (*i.e.*, hip, knee or shoulder).

56.     As OCBC concluded in the OCBC Audit, "MRSA screening cultures are billed [by BIDMC] without physician orders / documented signs, symptoms, [or] medical necessity."

57.     The OCBC Audit confirmed that, in three (3) of the forty-one (41) cases audited by OCBC, BIDMC improperly submitted claims for reimbursement to Medicare or Medicaid for a MRSA screening test. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 5, 11 & 21). Medicare and Medicaid reimbursed BIDMC for these tests.

58.     On September 10, 2012, in her "Management Response" to the OCBC Audit and OCBC's recommendations, O'Toole asserted that "Revenue Cycle Operations cannot determine medical necessity of charges, so RCO will create programming to reverse all MRSA charges from PAT claims, prior to billing in IBAX." "RCO" included BIDMC's Revenue Cycle Operations, Patient Accounts and Patient Financial Services departments. "IBAX" is BIDMC's computer billing system.

59.     On September 10, 2012, in her "Management Response" to the OCBC Audit and OCBC's recommendations, O'Toole further pledged that, prior to October 12, 2012, "RCO [would] refund those claims identified during [the internal] audit where MRSA was billed and paid." (emphasis added). In the February 2013 draft OCBC Audit

report, and in the March 2013 final OCBC Audit report, O'Toole represented in her "Management Response" that "[a]ll . . . screening MRSA cultures identified as overpayments in this audit have been refunded." (emphasis added). Any such refunds made by BIDMC were improperly limited to just the forty-one (41) specific cases in the OCBC Audit.

60. In the February 2013 draft OCBC Audit report, and in the March 2013 final OCBC Audit report, O'Toole further represented in her "Management Response" that "[a]ll billing for screening MRSA services at BIDMC has stopped (on 12/11/2012)[.]"

61. The MRSA screening tests conducted pursuant to BIDMC's internal policy were not properly subject to reimbursement by Federal health care programs.

62. BIDMC's submission of claims to Federal health care programs for reimbursement for MRSA screening tests that were not properly subject to reimbursement were false claims. BIDMC's false claims resulted in overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

### *"New Patient" Hospital Visits*

63. From no later than September 2001 and continuing to the present, BIDMC has submitted thousands of claims to Federal health care programs for reimbursement for Evaluation and Management ("E/M" or "E&M") services that have been "upcoded" as "new patient" hospital visits.

64. "A common type of false claim is 'upcoding,' which refers to using billing codes that reflect a more severe illness than actually existed or a more expensive

16

treatment than was provided." OIG Brochure, *A Roadmap for New Physicians: Avoiding Medicare and Medicaid Fraud and Abuse*, at 10.

65.     "E/M services are visits with beneficiaries by physicians and nonphysician practitioners . . . to assess and manage patients' health." OIG Report, *Coding Trends of Medicare Evaluation and Management Services*, May 2012, at 1.  E/M services are billed to Federal health care programs through the use of Current Procedural Terminology ("CPT") codes and Healthcare Common Procedure Coding System ("HCPCS") codes. Generally speaking, the CPT codes are a proprietary coding system developed by the American Medical Association, and the HCPCS codes, which were developed by the Center for Medicare & Medicaid Services (CMS), incorporate the CPT codes.  There are five different levels of E/M procedure codes that are based on the degree of physician effort involved in the patient visit, and a further demarcation is made between the evaluation and management of "new patients" and "established patients."

66.     From April 2000 until December 2008, "[t]he meaning of 'new' and 'established' pertain[ed] to whether or not the patient already ha[d] a hospital medical record number." 65 Fed. Reg. 18434, 18451 (Apr. 7, 2000).  That is, "[i]f the patient ha[d] a hospital medical record that was created within the past 3 years, that patient [was] considered an established patient to the hospital." 73 Fed. Reg. 68502-01, 68677 (Nov. 18, 2008).

67.     From January 2009 to the present, "the meanings of 'new' and 'established' patients pertain to whether or not the patient has been registered as an inpatient or an outpatient of the hospital within the past 3 years.  A patient who has been registered as an inpatient or outpatient within the 3 years prior to the visit would be

considered to be an established patient for that visit, while a patient who has not been registered as an inpatient or outpatient of the hospital within the 3 years prior to the visit would be considered to be a new patient for that visit." 73 Fed. Reg. 68502, 68679 (Nov. 18, 2008).

68. "New patient visits generally require more time than follow-up visits for established patients, and therefore E&M codes for new patients command higher reimbursement rates than E&M codes for established patients. An example of upcoding is an instance when you provide a follow-up office visit of follow-up inpatient consultation but bill using a higher level E&M code as if you had provided a comprehensive new patient office visit or an initial inpatient consultation." OIG Brochure, *A Roadmap for New Physicians: Avoiding Medicare and Medicaid Fraud and Abuse*, at 10. BIDMC is aware of OIG's position on this issue, as OIG's brochure has been posted on BIDMC's website.

69. BIDMC's compliance policy, Policy# ADM-09, states that examples of "false claims" include "billing for a higher level of service than was actually provided[.]"

70. As OCBC concluded in the OCBC Audit, BIDMC neglected to implement any internal guidelines for reporting the appropriate level of E/M service codes.

71. As OCBC concluded in the internal audit, BIDMC implemented practices and procedures that actually required "upcoding." For instance, "[t]he PAT Cost Center 8666 (Rev. 09/11) form [*i.e.*, the form sent from the PAT Clinic to BIDMC's billing department for processing] contains charge codes for new hospital E&M services only."

72. The OCBC Audit confirmed that, in 100% of the forty-one (41) cases audited by OCBC, the E/M charges for the PAT Clinic services "were coded and billed

18

[by BIDMC] as a new patient hospital E&M service[.]" *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 1-41). Medicare and Medicaid reimbursed BIDMC for these "upcoded" claims.

73.     Approximately eighty-five percent (85%) of the cases in the OCBC Audit should have been coded as "established patient" hospital visits. For example, Patients 20 through 40 from the OCBC Audit were "established patients," but BIDMC "upcoded" the E/M charges for their PAT Clinic services as "new patients." *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 20-40).

74.     With respect to E/M charges for PAT Clinic services, it has been BIDMC's practice to always code all of those E/M charges as "new patient" hospital visits. BIDMC also has, and continues to, improperly "upcode" E/M charges for services provided in other clinics and departments within the hospital. For example, BIDMC "upcoded" an Orthopedic Clinic visit on Mar. 8, 2013, for Patient 21 from the OCBC Audit as a "new patient" visit, and, for Patient 40 from the OCBC Audit, BIDMC "upcoded" a Dermatology Clinic visit on Aug. 24, 2010 and a Podiatry Clinic visit on June 28, 2010 as "new patient" visits. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 21 & 40).

75.     During the period from April to September 2009, the PAT Clinic scheduled 5,477 patient visits, 1,449 of which were for Medicare patients. During this six month period, BIDMC billed Medicare over three hundred thousand dollars ($300,000.00) for these PAT Clinic visits.

76.     In fiscal year 2011, as OCBC reported, "[t]he PAT clinic scheduled 3,486 visits and charged 3,416 Evaluation and Management (E&M) codes to Medicare and

19

MassHealth [*i.e.*, the Medicaid program in Massachusetts]." The OCBC Audit confirmed that all of the three thousand four hundred and sixteen (3,416) charges submitted to Medicare and Medicaid by BIDMC in fiscal year 2011 for E/M services provided in the PAT Clinic were coded and billed as "new patient" clinic visits.

77.    In fiscal year 2012, according to American Hospital Directory, Inc., BIDMC reported one hundred fourteen thousand two hundred and twenty-six (114,246) patient claims for hospital clinic visits (levels 2, 3 and 4 combined).

78.    On September 10, 2012, in her "Management Response" to the OCBC Audit and OCBC's recommendations, O'Toole stated the following: "As of June 1, 2012, we had identified the issue of billing new vs. established patient visits, and are fixing all new patient visits in RCO. There is no mechanism for the front end to correctly identify the history of the patient visits prior to charging, as we can on the back end. Programming is under way to fix this issue hospital wide. As we will no longer be billing for E&M services [provided in the PAT Clinic], there will be no need to change the services on fee ticket from new to established."

79.    In the March 2013 final OCBC Audit report, O'Toole represented in her "Management Response" that "[i]nternal controls have been established to prevent billing of incorrectly coded new patient technical E&M charges at BIDMC (on June 1, 2012)[,]" and that "[a]ll E&M hospital technical charges . . . identified as overpayments in this audit have been refunded[.]" (emphasis added).    Any such refunds made by BIDMC were improperly limited to just the forty-one (41) specific cases in the OCBC Audit.

80.    The E/M services "upcoded" as "new patient" hospital visits were not properly subject to separate reimbursement by Federal health care programs.

20

81.     BIDMC's submission of claims to Federal health care programs for reimbursement for E/M services improperly "upcoded" as "new patient" hospital visits were false claims. BIDMC's false claims resulted in overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

### *Pre-anesthesia Assessments*

82.     From no later than September 2001 and continuing until at least December 2012, BIDMC has submitted thousands of claims to Federal health care programs for reimbursement for pre-anesthesia assessments conducted in the PAT Clinic that were "unbundled" from the payments that BIDMC received for the related surgeries.

83.     "Unbundling," which also is one "of the special areas of OIG concern," has been defined as "the practice of submitting bills piecemeal or in fragmented fashion to maximize reimbursement for various tests or procedures that are required to be billed together and therefore at a reduced cost." Fed. Reg. 8987, 8990 & n.20 (Feb. 23, 1998).

84.     "Unconditionally packaged services are services for which separate payment is never made because the payment for the service is always packaged into the payment for other services." Medicare Claims Processing Manual, Ch. 4, §10.4.C.1.

85.     Pre-anesthesia assessments are an inherent and inseparable part of anesthesia services, and payments for pre-anesthesia assessments are subsumed within the reimbursement codes for anesthesia services. *See, e.g.*, 42 C.F.R. § 482.52(b)(1); National Correct Coding Initiative Policy Manual for Medicare Services (Rev. 1/1/13), Ch. II.B.1., at II-3, Ch. II.B.3, at II-4 & Ch. II.B.6., at II-7.

86.     Payments for anesthesia services (including pre-anesthesia assessments) are unconditionally packaged into the payments for the related surgeries. *See, e.g.*, 42

21

C.F.R. §§ 419.2(b)(4) & (5); 77 Fed. Reg. 68210, 68271 (Nov. 15, 2012); 72 Fed. Reg. 66580, 66611 (Nov. 27, 2007); 69 Fed. Reg. 50448, 50537 (Aug. 16, 2004).

87.     Pursuant to an internal BIDMC policy from 2001 through 2012, every patient seen in the PAT Clinic underwent a pre-anesthesia assessment. The PAT Order Form advised physicians of this policy as follows: "*All patients with clinic appointments will automatically have both an anesthesia and a nursing assessment.*" (emphasis in original).

88.     During the period from October 2008 through December 2012, there were thirty-five thousand five hundred and eighteen (35,518) in-person visits in the PAT Clinic.

89.     The OCBC Audit confirmed that, in 100% of the forty-one (41) cases audited by OCBC, BIDMC "had pre-anesthesia assessments on the claim[s] (as technical evaluation and management codes)" that were improperly "unbundled" and submitted to Medicare and Medicaid for reimbursement. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 1-41). OCBC further confirmed that "0 of 41 cases had practitioner orders for the pre-anesthesia assessment." Medicare and Medicaid reimbursed BIDMC for these claims.

90.     In August 2012, OCBC made the following recommendation to BIDMC's management: "On or before October 12, 2012, report and refund the 41 PAT pre-anesthesia assessments / E/M services coded, billed and reimbursed in error[.]"

91.     On September 10, 2012, in her "Management Response" to the OCBC Audit and OCBC's recommendations, O'Toole pledged that BIDMC would take the following actions: "1. All E&M hospital technical charges will be removed from the

22

PAT visit ticket. As we do all charging payer 'blind' we will not bill others [sic] payers as well as the government payers. 2. We will refund all payments made on claims identified during this audit prior to October 12, 2012, within the 60 day overpayment policy." (emphasis added). In the February 2013 draft OCBC Audit report, and in the March 2013 final OCBC Audit report, O'Toole represented in her "Management Response" that "[a]ll E&M hospital technical charges . . . identified as overpayments in this audit have been refunded[,]" (emphasis added), and that "[a]ll E&M hospital technical charges (which are comprised of pre-anesthesia assessments and sometimes history and physicals) have been removed from the PAT visit ticket and billing for these services has stopped (on 12/4/2012)[.]" Any such refunds made by BIDMC were improperly limited to just the forty-one (41) specific cases in the OCBC Audit.

92.     The pre-anesthesia assessments conducted in BIDMC's PAT Clinic were not properly subject to separate reimbursement by Federal health care programs.

93.     BIDMC's "unbundling" and submission of claims to Federal health care programs for reimbursement for pre-anesthesia assessments conducted in BIDMC's PAT Clinic were false claims. BIDMC's false claims resulted in overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

### *History & Physical Assessments*

94.     From no later than September 2001 and continuing until at least December 2012, BIDMC has submitted thousands of claims to Federal health care programs for reimbursement for history and physical assessments ("H&Ps") conducted in the PAT Clinic that were "unbundled" from the payments that BIDMC received for the related surgeries.

95.     Every surgical patient must have an H&P in order to assess the overall condition of the patient and identify any concerns that might affect the anticipated surgery. *See, e.g.*, 42 C.F.R. § 482.51(b). H&Ps are an inherent and inseparable part of surgical services, and payments for H&Ps are packaged into the payment for the related surgery.

96.     As OCBC confirmed in the OCBC Audit, H&Ps "are performed by PAT (Hospital or HMFP) staff when requested by the surgeon and sometimes in addition to the H&P performed by the surgeon[,]" and "[t]he PAT History and Physical is then billed by PAT to the payer along with the pre-anesthesia assessments in the E&M charge (the H&P contributes to the level assigned)."

97.     During the period from October 2008 through December 2012, the PAT Clinic performed twenty-six thousand five hundred and thirty-two (26,532) H&Ps.

98.     In 75% of the forty-one (41) cases audited by OCBC, an H&P was performed in the PAT Clinic and BIDMC improperly "unbundled" and submitted claims to Medicare and Medicaid for reimbursement for the H&Ps. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 1, 3-15, 18-25, 27-29, 31-32, 34, 38-39 & 41). OCBC further confirmed that many of the H&Ps conducted in the PAT Clinic duplicated H&Ps performed by surgeons or other physicians. Medicare and Medicaid reimbursed BIDMC for these claims.

99.     Any refunds made by BIDMC for the E/M charges that included H&Ps were improperly limited to just the forty-one (41) specific cases in the OCBC Audit.

100.    The H&Ps conducted in BIDMC's PAT Clinic were not properly subject to separate reimbursement by Federal health care programs.

101.    BIDMC's "unbundling" and submission of claims to Federal health care programs for reimbursement for H&Ps conducted in BIDMC's PAT Clinic were false claims. BIDMC's false claims resulted in overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

## *Modifier 25*

102.    From no later than September 2001 and continuing at least until December 2012, BIDMC has misused modifier 25 in connection with its submission of thousands of claims to Federal health care programs for reimbursement for E/M services.

103.    Modifier 25 is used by providers to facilitate payment for E/M services that would otherwise not be subject to reimbursement by Federal health care programs.

104.    Modifier 25 is appended to E/M reimbursement codes to signify that the service was a "significant, separately identifiable evaluation and management service by the same physician on the same day of the procedure or other service." *See* CMS Transmittal A-01-80, at 1 (June 29, 2001).

105.    As OIG has explained: "Medicare payments for medical procedures include payments for certain evaluation and management (E/M) services that are necessary prior to the performance of a procedure. The Center for Medicare & Medicaid Services (CMS) does not normally allow additional payments for separate E/M services performed by a provider on the same day as a procedure. However, if a provider performs an E/M service on the same day as a procedure that is significant, separately identifiable, and above and beyond the usual preoperative and postoperative care associated with the procedure, modifier 25 may be attached to the claim to allow

additional payment for the separate E/M service." OIG Report, *Use of Modifier 25*, at 1 (Nov. 2005).

106.    "Upcoding occurs if a provider uses Modifier 25 to claim payment for an E&M service when the patient care rendered was not significant, was not separately identifiable, and was not above and beyond the care usually associated with the procedure." OIG Brochure, *A Roadmap for New Physicians: Avoiding Medicare and Medicaid Fraud and Abuse*, at 10.

107.    In 51% of the forty-one (41) cases from the OCBC Audit, BIDMC improperly appended modifier 25 to the E/M codes and submitted claims for reimbursement to Medicare and Medicaid. *See* BIDMC Audit Spreadsheet, Exh. 1 (identifying Patients 2-7, 9-11, 14, 16, 18, 21-23, 26, 28-29, 34, 39 & 41). Medicare and Medicaid improperly reimbursed BIDMC for these claims.

108.    In August 2012, OCBC concluded that BIDMC misused modifier 25 "because the documentation indicated the service was normal preoperative work which was included as part of the surgical package." BIDMC's use of modifier 25 also was improper because the pre-anesthesia assessments and H&Ps were not conducted "on the same day of the [surgical] procedure[s]."

109.    There was no specific "Management Response" to the OCBC Audit and OCBC's recommendations concerning BIDMC's misuse of modifier 25.

110.    The E/M reimbursement codes that BIDMC appended with modifier 25 were not properly subject to reimbursement by Federal health care programs.

111.    BIDMC's submission of claims to Federal health care programs for reimbursement for E/M services improperly "upcoded" with modifier 25 resulted in

overpayments to BIDMC by the U.S. and the Commonwealth. BIDMC has not fully refunded these overpayments.

### C. Relator's Knowledge of BIDMC's Fraudulent Practices

112.    In 2008 or 2009, Relator was involved in an initiative designed to improve the processes and decrease patient wait times at the PAT Clinic. As part of this work, Relator analyzed PAT Clinic pre-anesthesia evaluations performed during a one week period, which evidenced that approximately fifty percent (50%) of the patients underwent EKG testing. Relator reviewed the medical files for these patients and discerned that the EKGs were medically unnecessary. The EKGs were ordered and conducted as part of BIDMC's "Routine Package" of age-based screening tests.

113.    In or about January 2010, Mr. George Ogin ("Ogin"), BIDMC's Director of Reimbursement and Revenue Analysis, provided Relator with spreadsheets that detailed the charges and payments relating to some five thousand four hundred and seventy-seven (5,477) patients who were seen in the PAT Clinic between April and September 2009. About one thousand four hundred and forty-nine (1,449) of these cases were Medicare patients.

114.    Relator learned through the reports provided by Ogin that BIDMC was improperly billing, and being reimbursed by, Medicare for medically unnecessary tests that were ordered as part of BIDMC's "Routine Package" of age-based screening tests.

115.    Ogin explained to Relator that BIDMC was getting paid for these claims because BIDMC's billing department was "scrubbing" the claims, *i.e.*, adding diagnosis codes to the claims before they were submitted to Federal health care programs for reimbursement. Relator was told that BIDMC's "scrubbing" of Federal health care

claims was accomplished by coders in BIDMC's Patient Financial Services Department and BIDMC's Health Information Management Department.

116.    In April 2011, after reporting the problem to and consulting with his supervisor, Simon, Relator contacted OCBC to alert the hospital of the ongoing billing issues surrounding BIDMC's "Routine Package" of age-based screening tests.

117.    According to BIDMC's Policy# ADM-09, OCBC "is headed by the Chief Compliance and Privacy Officer (CCO) who is overseen by the Compliance Committee of [BIDMC's] Board [of Directors]." BIDMC's Policy# ADM-09 further explains that "[t]he CCO has direct access to both the President of the Medical Center and the Board of Directors; the CCO keeps the President and the Board advised of the [Compliance] Program."

118.    Relator's initial contact with OCBC was a telephone conversation with Dr. Leon Goldman ("Goldman"), BIDMC's CCO, and Ms. Andrea Williams ("Williams"), BIDMC's Deputy Chief Compliance Officer. During this conversation, Relator attempted to explain how BIDMC was improperly submitting claims and being reimbursed for medical and laboratory tests that were not medically necessary, and he offered to detail the fraudulent practices in a follow-up email. In response, Goldman explicitly directed Relator, "don't put anything in writing." In subsequent conversations, Williams reiterated to Relator that he should not document his concerns in writing. Williams later assured Relator that BIDMC would conduct an audit.

119.    In June 2011, two months after Relator brought his concerns to OCBC, Goldman departed BIDMC. At some point in 2011, Ms. Kelly Sauders ("Sauders"), a partner with Deloitte & Touche LLP, began serving as BIDMC's Interim CCO.

28

120.    On June 27, 2011, non-clinical personnel in the PAT Clinic (including Ms.

Chantal Duval and Ms. Jenifer Stone) informed Relator that, *inter alia*, they were

entering orders for medical and laboratory tests that had not been ordered by physicians.

Relator told the PAT Clinic staff that only physicians could lawfully order tests, and that

the PAT Clinic staff should neither order tests themselves nor enter reimbursement codes

for tests that were ordered by physicians.

121.    On July 7, 2011, Simon directed Relator to attend a meeting with

Canacari, the Director of Perioperative Services who oversees the PAT Clinic, "to discuss

recent interactions with the PAT associates[,]" *i.e.*, Relator's discussion with the PAT

Clinic personnel on June 27, 2011. During the subsequent meeting among Relator,

Simon and Canacari on July 12, 2011, Canacari stated that Relator's actions constituted

"harassment" in violation of BIDMC's policies. The matter was dropped after Relator

showed his supervisor, Simon, and Canacari BIDMC and Medicare policies indicating

that the reimbursement code entered by the PAT Clinic technicians (*i.e.*, V72.83) did not

support a reimbursement claim for preoperative testing. Canacari, as the head of the PAT

Clinic, contended that "those rules don't apply to surgery." Following the meeting,

Canacari continued to permit the PAT Clinic personnel to order medical and laboratory

tests that were not reasonable and necessary.

122.    On July 29, 2011, Williams, BIDMC's Deputy Chief Compliance Officer,

provided Relator with a draft internal audit report that had been prepared by O'Toole,

BIDMC's Senior Director of Patient Financial Services, and Abrahamian, BIDMC's

Director of Health Information Management ("the July 2011 Audit"). According to the

internal audit report, "[t]he audit work was performed in the Health Information Management and Patient Financial Services Departments."

123. In the July 2011 Audit, O'Toole and Abrahamian reviewed a supposedly "random" sample of fifty-five (55) Medicare claims with dates of service between May 1-31, 2011. In the end, O'Toole and Abrahamian concluded that "[o]ne hundred percent of the pre-admission testing services in our sample were allowable under Medicare criteria. [BIDMC] officials agreed that these claims had appropriate pre-admission testing charges."

124. During August 2011, O'Toole conducted another internal audit in which she explored whether there were "signed MD orders for any PAT ancillary testing[.]" O'Toole reviewed fifty-four (54) cases from May 2011, and twenty-two (22) of these cases were Medicare patients ("the August 2011 Audit"). Among other findings, O'Toole found that, in more than half of the cases that she reviewed, ancillary tests had been conducted in the PAT Clinic in the absence of a physician's order. O'Toole reported that ancillary medical and laboratory tests had been conducted in fifty-one (51) of the fifty-four (54) audited cases, and in twenty-eight (28) of those cases there was no physician's order for the ancillary medical and laboratory tests. O'Toole further found that "100% of cases had multiple diagnoses for the PAT visit." In other words, non-clinical staff members in the PAT Clinic improperly "ordered" the ancillary medical and laboratory tests, and BIDMC's billing department later coded the claims to provide false justification for obtaining reimbursement for the ancillary medical and laboratory tests from Federal health care programs.

Case 1:13-cv-11860-IT Document 2 Filed 08/05/13 Page 31 of 42

125. Not long after the August 2011 Audit, Sauders, in her role as BIDMC's Interim CCO, introduced several new compliance policies to BIDMC's management, specifically including: Policy # ADM-38, *Compliance Audit and Monitoring*; Policy# ADM-40, *False Claims and Payment Fraud Prevention*; Policy# ADM-41, *Government Interactions Policy*; Policy# ADM-42, *Hotline and Reporting Policy*; and Policy# ADM-43, *Self-Reporting – Voluntary Disclosure*.

126. In October 2011, BIDMC's management formally approved the compliance policies introduced by Sauders (with the exception of Policy# ADM-41, which was not approved until March 2012), and then BIDMC relieved Sauders of her duties as the Interim CCO. Mr. Jamie Katz then became the interim Senior Vice President of Compliance.

127. On November 16, 2011, frustrated by the fact that the illegal practices were continuing, Relator emailed Maurer, Senior Vice President, BIDMC Patient Care Services and Chief Nursing Officer. Relator expressed his concerns that surgeons were not providing diagnosis codes demonstrating the medical necessity of the medical and laboratory tests that were being conducted, and that BIDMC's billing department was improperly "scrubbing" the claims before submitting them to Medicare. Relator ended his email to Maurer with the following: "I strongly urge that we act immediately so that we do not continue to operate out of compliance."

128. Two days later, on November 18, 2011, Maurer emailed Relator and thanked him for his "leadership," and she suggested that another audit was in order. After receiving Maurer's email, Relator met with Simon, and Simon then emailed Maurer to "reiterate the need to move forward." Simon, in consultation with Relator, suggested

31

that, *inter alia*, the coding problem had to be remedied and that they "need[ed] to understand what the downstream coding processes are that are somehow allowing these uncoded tests to get either coded or billed and fix those as well."

129. As suggested by Maurer, O'Toole conducted another internal audit. In this internal audit, O'Toole reviewed twenty-seven (27) Medicare cases with dates of service between November 1-11, 2011 ("the November 2011 Audit"). In the November 2011 Audit, as in the August 2011 Audit, O'Toole investigated whether ancillary tests performed through the PAT Clinic were occasioned by a physician's order, and she again found that the majority of the ancillary tests had been conducted in the PAT Clinic in the absence of a physician's order. As O'Toole found, sixteen (16) of the twenty-seven (27) cases did not have a valid physician's order.

130. On December 6, 2011, a "compliance meeting" was held among Maurer, Simon, Canacari, O'Toole, Sauders and Relator. In an email dated December 7, 2011, Sauders summarized the compliance meeting and memorialized "action items." As Sauders explained, "Beth [O'Toole] presented results of an internal review of 27 November 2011 Medicare PAT claims; numerous opportunities for improvement (e.g. orders, medical necessity of ordered tests, etc.)."

131. In her December 7, 2011 email, Sauders further stated that O'Toole was "to process Medicare refunds/adjustments for services where [BIDMC] was missing [physician] orders from the sample of 27." The stated obligation to refund Medicare was, however, limited to the 27 cases from the November 2011 Audit. No mention was made of the cases audited in the August 2011 Audit, and there was no apparent attempt to

32

extrapolate the findings from the November 2011 Audit (or from the August 2011 Audit) to identify the complete extent of overcharges over the past several years.

132. At some point prior to December 21, 2011, BIDMC's Chief Financial Officer, Mr. Steve Fischer, introduced Policy# ADM-45, *Reporting and Refunding Overpayments*, which policy was formally adopted in January 2012. BIDMC's Policy# ADM-45 "applies to overpayments identified during billing compliance routine monitoring, internal audits, and/or billing compliance investigations." According to BIDMC's Policy# ADM-45, "[o]verpayments include, but are not limited to finding of upcoding, incorrect code or modifier resulting in a higher level of reimbursement, insufficient or lack of documentation to support billed services . . . lack of medical necessity . . . or any other finding that reflects an overpayment was received by BIDMC as a result of inaccurate or improper coding or reporting of health care items or services."

133. On May 8, 2012, a "compliance meeting" was held among Mr. John Goulart ("Goulart"), BIDMC's new OCBC Director of Compliance Audit and Billing, Simon, Dorion, Williams, Sauders. In an email dated May 25, 2012, Simon explained that the May 8, 2012 compliance meeting was held "to discuss the practices at PAT" and that authority over "[t]he Pre-admission (PAT) case was transferred to Goulart." Simon's May 25, 2012 email further documented that one of Goulart's "next steps" was to "meet one on one with [Relator]."

134. On May 10, 2012, Relator met with Goulart to discuss various issues surrounding a new proposed audit. On June 3, 2012, Relator provided a summary of that meeting to the PAT Clinic compliance group and others, specifically including Goulart, Williams, Maurer, Canacari, Dorion, Simon and Sauders. In his summary, Relator also

33

raised the issue that, "[a]lthough we were told many months ago that the BIDMC reimbursed CMS [*i.e.* the Centers for Medicare and Medicaid Services] for a small number of patient invoices that had been incorrectly billed, we lack documentation that such payments were made. We need to resolve this discrepancy." And once again, Relator emphasized the need for immediate reform: "It appears that our practice of ordering lab tests at the BIDMC has been, and continues to be, out of compliance with CMS policy and perhaps other payers. This concern was broached with the OCBC in April 2011. It is now more than a year since we began addressing this problem and how to implement corrective actions and reimburse payers who have been billed incorrectly. Hopefully, we will resolve all of these concerns soon."

135. On June 11, 2012, Goulart emailed Relator and Simon a draft of the OCBC's "Pre-Admission Testing Clinic Compliance Audit Scope." Goulart asked Relator and Simon for their "approval, concerns, or additional requests[,]" and Relator subsequently provided Goulart with comments and suggestions about the proposed compliance audit.

136. Ultimately, OCBC conducted the OCBC Audit. OCBC distributed draft audit reports of the OCBC Audit on August 15, 2012, November 26, 2012 and February 9, 2013. OCBC's final audit report was released on or about March 13, 2013.

137. In the end, OCBC concluded that BIDMC had overcharged Medicare and Medicaid in every single one of the forty-one (41) audited cases. In every case, not only did BIDMC improperly submit claims for hospital visits, but it also overcharged Medicare and Medicaid for ancillary medical and/or laboratory tests that were not medically necessary.

138.     As summarized in the November 2012 draft OCBC Audit report, "[i]n this audit of outpatient services billed to Medicare and MassHealth [*i.e.*, the Medicaid program in Massachusetts], OCBC observed internal control weaknesses in documentation, charge capture, coverage, coding accuracy, billing accuracy, policies / procedures and training and education which appear to have resulted in overpayments from the government payers."

139.     As noted in the March 2013 final OCBC Audit report, OCBC also confirmed that BIDMC failed to properly maintain relevant medical records and neglected to implement policies and procedures to prevent improper billing practices. For example, OCBC noted that "[c]laims supporting documents must be retained for 10 years to be in accordance with the Federal False Claims Act[,]" but that OCBC could not locate relevant medical records (such as the PAT Order Form and the PAT visit ticket) in 46% of the audited cases. OCBC further identified the following problems at BIDMC: "PAT [Clinic] policies and procedures neither assure proper document retention nor address the roles and responsibilities of the PAT [Clinic] staff members."; "A lack of training and education materials for referring surgeons (and their staff) and the PAT [Clinic] associates which assure authenticated orders written for ancillary testing written and retained for ten years."; and "PAT [Clinic] does not have a monitoring process to assure that referring surgeons and their staff and PAT [Clinic] associates are consistently writing authenticated orders for ancillary testing."

140.     On June 27, 2013, Simon informed Relator that he was being removed as the Medical Director of the PAT Clinic. Dr. Sheila Barnett is now the Medical Director of the PAT Clinic.

## COUNT I – VIOLATIONS OF THE FALSE CLAIMS ACT

141.    Relator hereby incorporates paragraphs 1-140 above as if fully set forth herein.

142.    Relator's *qui tam* action is not based upon the public disclosure of allegations or transactions in any criminal, civil, or administrative hearing, in any congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media.

143.    Relator has direct and independent knowledge of the information on which the allegations are based.

144.    Prior to filing this action, Relator served the Attorney General of the United States and the United States Attorney for the District of Massachusetts with a written disclosure of substantially all material evidence and information then in Relator's possession.

145.    BIDMC's actions as detailed above resulted in numerous violations of the FCA occurring over a long period of time. Further evidence of BIDMC's specific violations of the FCA resides within BIDMC's exclusive possession and/or control.

146.    The Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 11-21, 123 Stat. 1617 ("the FERA"), amended the FCA by, *inter alia*, restructuring the subsections of 31 U.S.C. § 3729. Pursuant to Section 4(f) of the FERA, the amendments to 31 U.S.C. §§ 3729(a)(1) and (a)(7) took effect and apply to conduct on or after May 20, 2009, while the amendment to 31 U.S.C. § 3729(a)(2) was made retroactive. As BIDMC's unlawful conduct as described herein spans the dates on which the FCA was

amended and made effective, both the 1986 and 2009 versions of the FCA are applicable here.

147.    From no later than September 18, 2001 and continuing until May 19, 2009, in violation of 31 U.S.C. § 3729(a)(1)(as amended in 1986), BIDMC knowingly presented, and/or caused to be presented, to the U.S. numerous false or fraudulent claims for payment or approval.

148.    From May 20, 2009 and continuing until the present, in violation of 31 U.S.C. § 3729(a)(1)(A)(as amended in 2009), BIDMC knowingly presented, and/or caused to be presented, numerous false or fraudulent claims for payment or approval.

149.    From no later than September 18, 2001 and continuing until June 6, 2008, in violation of 31 U.S.C. § 3729(a)(2)(as amended in 1986), BIDMC knowingly made, used, and/or caused to be made or used, numerous false records and/or statements to get numerous false or fraudulent claims paid or approved by the U.S.

150.    From June 7, 2008 and continuing until the present, in violation of 31 U.S.C. § 3729(a)(1)(B)(as amended in 2009), BIDMC knowingly made, used, and/or caused to be made or used, numerous false records and/or statements material to the numerous false or fraudulent claims.

151.    From no later than September 18, 2001 and continuing until May 19, 2009, in violation of 31 U.S.C. § 3729(a)(7)(as amended in 1986), BIDMC knowingly made, used, and/or caused to be made or used, numerous false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the U.S.

152.    From May 20, 2009 and continuing to the present, in violation of 31 U.S.C. § 3729(a)(1)(G)(as amended in 2009), BIDMC knowingly made, used, and/or

caused to be made or used, numerous false records and/or statements material to an obligation to pay or transmit money or property to the U.S., and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the U.S.

153.    From no later than 2012 and continuing until the present, BIDMC, in violation of 42 U.S.C. § 1320a-7k(d), has failed to report and return the full amount of the overpayments that it has received over the years. The overpayments include the amounts that BIDMC identified in the specific cases from BIDMC's self-audits (*i.e.*, the August 2011 Audit, the November 2011 Audit and the OCBC Audit), and the amounts that BIDMC received in the thousands of non-audited cases, which amounts could reasonably be determined based on extrapolations from BIDMC's self-audits. As a result of BIDMC's self-audits and Relator's reports, BIDMC had a duty to make a reasonable inquiry to determine the full extent of the overpayments. BIDMC has identified the overpayments, since it has actual knowledge of the existence of the overpayments or acted in reckless disregard or deliberate ignorance of the existence of the overpayments. The overpayments retained by BIDMC constitute "obligations" under the FCA. *See* 42 U.S.C. § 1320a-7k(d)(3).

154.    From no later than September 18, 2001 and continuing until the present, the U.S., unaware of the falsity of the records, statements and/or claims made and/or caused to be made by BIDMC, paid claims relating to hospital visits and ancillary perioperative medical and laboratory testing that would not have been paid but for BIDMC's unlawful practices as detailed above.

155.    As a result of BIDMC's acts and practices, the U.S. has been damaged and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II – VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS ACT

156.    Relator hereby incorporates paragraphs 1-155 above as if fully set forth herein.

157.    Prior to filing this action, Relator served the Attorney General of Massachusetts with a written disclosure of substantially all material evidence and information then in Relator's possession.

158.    The MFCA was amended effective July 1, 2012. As BIDMC's unlawful conduct as described herein spans the date on which the MFCA was amended and made effective, both the 2000 and 2012 versions of the MFCA are applicable here.

159.    From no later than 2003 and continuing until the present, in violation of Mass. Gen. Laws c. 12, § 5B(a)(1)(as amended in 2012), BIDMC has knowingly presented and/or caused to be presented, numerous false or fraudulent claims for payment or approval.

160.    From no later than 2003 and continuing until June 30, 2012, in violation of Mass. Gen. Laws c. 12, § 5B(2)(as added in 2000), BIDMC knowingly made, used, and/or caused to be made or used, numerous false records and/or statements to obtain payment or approval of claims by the Commonwealth or a political subdivision thereof.

161.    From July 1, 2012 and continuing until the present, in violation of Mass. Gen. Laws c. 12, § 5B(a)(2)(as amended in 2012), BIDMC knowingly made, used and/or caused to be made or used numerous false records and/or statements material to numerous false or fraudulent claims.

162. From July 1, 2012 and continuing until the present, in violation of Mass. Gen. Laws c. 12, § 5B(a)(5)(as amended in 2012), BIDMC has had possession, custody and/or control of property or money used, or to be used, by the Commonwealth or a political subdivision thereof and has knowingly delivered, and/or has caused to be delivered, to the Commonwealth or a political subdivision thereof less than all of that property or money.

163. From no later than 2003 and continuing until June 30, 2012, in violation of Mass. Gen. Laws c. 12, § 5B(8)(as added in 2000), BIDMC knowingly made, used, and/or caused to be made or used, numerous false records and/or statements to conceal, avoid, and/or decrease an obligation to pay or to transmit money or property to the Commonwealth or a political subdivision thereof.

164. From July 1, 2012 and continuing until the present, in violation of Mass. Gen. Laws c. 12, § 5B(a)(9)(as amended in 2012), BIDMC has knowingly made, used and/or caused to be made or used numerous false records and/or statements material to an obligation to pay or to transmit money or property to the Commonwealth or a political subdivision thereof, and/or has knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth or a political subdivision thereof.

165. From July 1, 2012 and continuing until the present, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10)(as amended in 2012), BIDMC has been a beneficiary of overpayments from the Commonwealth or a political subdivision thereof, and BIDMC subsequently has discovered the receipt of the overpayments and has failed to disclose the receipt of the overpayments to the Commonwealth or a political subdivision thereof.

166.    The Commonwealth, unaware of the falsity of the records, statements and/or claims made or caused to be made by BIDMC, paid claims that would not have been paid but for BIDMC's unlawful practices as detailed above.

167.    As a result of BIDMC's acts and practices, the Commonwealth has been damaged, and continues to be damaged, in a substantial amount.

## COUNT III – INJUNCTIVE AND DECLARATORY RELIEF

168.    Relator hereby incorporates paragraphs 1-167 above as if fully set forth herein.

169.    There exists an actual controversy between the U.S. and the Commonwealth and BIDMC.

170.    Relator, on behalf of the U.S. and the Commonwealth, requests the following equitable relief:

> a. that a judicial determination and declaration be made of the rights of the U.S. and the Commonwealth, and the corresponding responsibilities of BIDMC;
>
> b. that BIDMC be ordered to cease its unlawful practices, as described more fully above; and
>
> c. that any further equitable relief that this Court deems just be afforded the U.S. and the Commonwealth.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against BIDMC and for relief as

follows:

        1.  for damages and civil penalties as allowed under the FCA and the

MFCA;

        2.  for treble damages as allowed under the FCA and the MFCA;

        3.  for the maximum relator award allowed under the FCA and the

MFCA;

        4.  for expenses, attorneys' fees and costs pursuant to 31 U.S.C. § 3730,

and Mass. Gen. Laws c. 12, § 5F;

        7.  for interest;

        8.  for declaratory and injunctive relief; and

        9.  for such other and further relief as this Court deems just.

## JURY DEMAND

## RELATOR DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted,
For the Relator,

Fredric L. Ellis, Mass. BBO # 542075
Edward D. Rapacki, Mass. BBO # 411910
Joseph M. Makalusky, Mass. BBO # 631240
ELLIS & RAPACKI LLP
85 Merrimac Street, Suite 500
Boston, MA 02114
(617) 523-4800
(617) 523-6901 (facsimile)
jmakalusky@ellisrapacki.com

Dated:  August 5, 2013